JPL:JD
F.# 2015R00319

# 15M 626

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA

    - against -

MICHAEL J. DODD,
    also known as "Mike" and
    "Michael Stanley,"
KENNETH ARDELL LANDGAARD,
    also known as "Ken" and
JAMES ROBERT SHIPMAN JR.,
    also known as "Robert,"

                Defendants.

--------------------------------------------------X

To Be Filed Under Seal

COMPLAINT AND AFFIDAVIT IN
SUPPORT OF APPLICATION FOR
ARREST WARRANTS

(T. 18 U.S.C. § 1956(h))

EASTERN DISTRICT OF NEW YORK, SS:

        THOMAS McGUIRE, being duly sworn, deposes and says that he is a Special

Agent with the Federal Bureau of Investigation ("FBI"), duly appointed according to law and

acting as such.

        In or about and between November 2014 and July 2015, both dates being

approximate and inclusive, within the Eastern District of New York and elsewhere, the

defendants MICHAEL J. DODD, also known as "Mike" and "Michael Stanley," KENNETH

ARDELL LANDGAARD, also known as "Ken" and JAMES ROBERT SHIPMAN JR., also

known as "Robert," together with others, did knowingly and willfully conspire:

        a.    to conduct financial transactions affecting interstate commerce,

specifically the interstate wire transfer of money and securities, which transactions involved

property represented by an undercover federal law enforcement officer authorized to investigate

violations of Title 18, United States Code, Section 1956, to be the proceeds of specified unlawful

- 1 -

activity, specifically, fraud in the sale of securities, contrary to Title 15, United States Code, Sections 78j(b) and 78ff, (i) with the intent to promote the carrying on of such specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of property believed to be the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(3)(B), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(3)(C); and

        b.     to transport, transmit and transfer a monetary instrument and funds from a place in the United States to and through a place outside the United States and to a place in the United States from and through a place outside the United States, (i) with the intent to promote the carrying on of specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(A), (ii) to conceal and disguise the nature, location, source, ownership and control of the proceeds of the specified unlawful activities, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(i), and (iii) to avoid a transaction reporting requirement under state and federal law, contrary to Title 18, United States Code, Section 1956(a)(2)(B)(ii).

        (Title 18, United States Code, Sections 1956(h) and 3551 et seq.)

        The source of your deponent's information and the grounds for his belief are as follows:

        1.     I have been a Special Agent with the FBI for approximately 12 years. I am currently assigned to an FBI squad which investigates securities fraud, wire fraud and other financial crimes, including money laundering. During my tenure with the FBI, I have participated in numerous financial fraud investigations and have participated in all aspects of investigations, including conducting surveillance, executing search warrants, debriefing defendants and

informants, interviewing witnesses, reviewing and analyzing recorded conversations and

analyzing telephone toll information. During the course of these investigations, I have served as

the lead investigator in the investigation and prosecution of persons involved in money

laundering, among other crimes.

2.      I have personally participated in the investigation of money laundering by

the defendants MICHAEL J. DODD, KENNETH ARDELL LANDGAARD and JAMES

ROBERT SHIPMAN JR., as discussed below. I am familiar with the facts and circumstances of

this investigation from, among other things: (a) my personal participation in this investigation, (b)

discussions with other law enforcement agents involved in this investigation and (c) my review of

evidence including consensual recordings, e-mails and bank records.

3.      Except as explicitly set forth below, I have not distinguished in this

affidavit between facts of which I have personal knowledge and facts of which I learned from

other law enforcement agents. Because this affidavit is being submitted for the limited purpose of

establishing probable cause to arrest the defendants MICHAEL J. DODD, KENNETH ARDELL

LANDGAARD and JAMES ROBERT SHIPMAN JR., I have not set forth each and every fact

learned during the course of this investigation. Instead, I have set forth only those facts that I

believe are necessary to establish probable cause for the arrest warrants sought herein. In

addition, where the contents of documents, or the actions, statements and conversations of others

are reported herein, they are reported in sum and substance and in part, except where otherwise

indicated. Summaries of recorded conversations are based upon draft transcripts of the

conversations, which are subject to revision.

4.      The defendant MICHAEL J. DODD, also known as "Mike" and "Michael

Stanley," is a U.S. citizen and resides in Panama. DODD works at High Secured in Panama City,

Panama, where he is a manager of the international services division. High Secured provides offshore web hosting, legal services, merchant accounts and call center services for U.S. and foreign clients. DODD oversees High Secured's off-shore legal services division, which, among other services, provides pre-existing Panamanian corporations and foundations with nominee directors and sets up off-shore bank and brokerage accounts for U.S. based and other clients.

5.      The defendant KENNETH ARDELL LANDGAARD, also known as "Ken," owns and operates Magjets Group, an aviation company in Panama City, Panama, which sells, leases, charters and brokers business jets and cargo aircraft. LANDGAARD is a U.S. citizen and resides in the United States.

6.      The defendant JAMES ROBERT SHIPMAN JR., also known as "Robert," is a business partner of the defendant KENNETH ARDELL LANDGAARD with self-professed expertise in setting up off-shore accounts. SHIPMAN is a U.S. citizen and resides in the United States.

7.      Since in or about November 2013, an accountant residing in Texas ("Accountant-1") has been the subject of an ongoing securities fraud, money laundering and tax evasion investigation being conducted by the FBI in cooperation with the Internal Revenue Service ("IRS") and United States Homeland Security Investigations ("HSI"). After Accountant-1 met with an undercover federal agent who was posing as corrupt stock promoter ("UC-1"), Accountant-1 offered to assist UC-1 with setting up off-shore brokerage accounts in Panama specifically for the purpose of facilitating UC-1's stock fraud, money laundering and tax evasion. Accountant-1 is one of the defendant MICHAEL J. DODD's largest clients and retained DODD's services to set up off-shore foundations in Panama for UC-1. In the process of setting up the off-shore foundations and off-shore brokerage accounts at a large Panamanian brokerage

firm ("Panamanian Brokerage Firm A"), Accountant-1 introduced UC-1 to DODD. On or about

October 22, 2014, UC-1 called DODD by phone to discuss how best to set up the off-shore

foundations and brokerage accounts, DODD advised that he was not comfortable discussing this

matter on the phone and suggested that UC-1 download encryption software provided by

DODD's company so that they could communicate securely. DODD explained that "the NSA

can't listen to it, nobody can, because it's encrypted end to end." UC-1 explained that he would

prefer a face to face meeting and DODD agreed to meet UC-1 in Panama. This call was recorded

by the FBI.

        8.      On or about November 13, 2014, UC-1 met the defendant MICHAEL J.

DODD, an accountant working for DODD ("Accountant-2"), and an attorney working for DODD

("Attorney-1"), at DODD's office in Panama City. On or about the following day, UC-1 met

DODD at DODD's residence in Panama City. Both of these meetings were recorded by the FBI.

        9.      During those two meetings, UC-1 explained to the defendant MICHAEL

J. DODD that he earned millions of dollars through stock market manipulation and stock broker

kickback schemes, that he wanted to conceal his activities from the SEC, the IRS and the FBI,

and that he wanted DODD to set up brokerage accounts in Panama to enable UC-1 to

anonymously continue that illegal activity. Specifically, UC-1 advised DODD that he wanted

DODD to set up brokerage accounts in Panama so that he could create trading volume by trading

stocks "from one account to another" to "get the stock price up" and that it "looks a lot better" if

the trading takes place between accounts at different brokerage firms rather than at accounts at

one and same brokerage firm. The following conversation ensued between UC-1 ("UC") and

DODD ("MD"):

            UC:     ... these stocks are garbage, a lot of them, like, really ...
                     low priced stock. Part of what I need to do is get the stock

price up so I would need to buy and sell between my accounts, so I'm buying and selling for myself, just to, you know, get the price up, manipulate it up.

MD:     Well, we're going to open up accounts at places other than [Panamanian Brokerage Firm A] so you can do that.

UC:     Yeah, because otherwise, if it wasn't for me, the price would be still in the shitter.  Excuse my French.

MD:     I got it.

    ...

UC:     That's the deal with the stocks. I mean, but for me, these stocks are pieces of shit. But I can get them, I can get the price going and that's what I do. So, and I make lots of money doing it, you know what I mean? So that's why I don't want the SEC in my business, the Securities and Exchange Commission, or anybody, like, in the U.S. That's why, to get it set up here [in Panama] is huge for me --

MD:     Uh-huh.

UC:     -- to be able to do this anonymously.

MD:     Well, you will be anonymous.

    ...

UC:     What I'm looking to do — I'll tell you exactly, I'll lay out the plan here — is get a bunch of different accounts, brokerage accounts. I want to trade back and forth. Um, I want to — I got to get the stock price up, right? And, you know, that's the kind of crap the SEC doesn't like.

MD:     Yeah, I know.

UC:     You know what I mean?

MD:     Manipulating the market.

UC:     We're manipulating the market, basically, but in a safe way. You know what I mean? I have been doing this for 15 years in the U.S. and never had a problem, the way I

operate. I am very careful. I am very cautious. I'm pretty safe. I'm not a cowboy. I do things the right way, uh, below, below the radar. But it is manipulating the market. Bottom line: the SEC, the FBI, they would love to say, you know, "hey, buddy, we have to talk to you". Which is why I want to get out of the U.S. and I want a base in Panama or wherever else. Um, and so that's the story. Doing that kind of business, you know, can generate millions of dollars. Basically, if I get a million dollars of trading for a company, they'll give me a kickback of 30% to 50% of that. So I'll get my $500,000 for trading a million dollars' worth of stock. Pretty lucrative business

MD:     Uh-huh.

UC:     My thing is, is, I want to be away from the SEC, away from the IRS, away from the U.S., and I want to be able to access that money. So my whole thing is the end game. How to get out, so I'm confident this is safe and secure here —

MD:     It is.

UC:     — if we do it out of Panama.

10.     Also during these two meetings in Panama, the defendant MICHAEL J. DODD explained in detail an elaborate scheme to launder cash from the United States through Panamanian bank accounts back to UC-1. DODD advised that he knew a "guy you can talk to about this – he sells jets and they transport money in safes." DODD advised that he would introduce UC-1 to "Ken" (who was later identified as the defendant KENNETH ARDELL LANDGAARD) and explained that LANDGAARD's services included "safes on the jet." When UC-1 advised that he had "significant amounts of cash" that he wanted to get into bank accounts in Panama, DODD agreed to accept delivery of the cash from LANDGAARD in Panama, and to store the cash in a safe at his (DODD's) residence and coordinate daily deposits of under $10,000 per account, that is, below the threshold requiring the filing of cash deposit reports in Panama,

until all the cash was deposited into Panamanian bank accounts. Once deposited, DODD could wire the funds to any account overseas or in the United States at the direction of UC-1.

11.     Also during these meetings in Panama, the defendant MICHAEL J. DODD explained how he could provide fraudulent invoices to UC-1 and advised that he regularly provided fraudulent documentation for wire transfers made on behalf of other clients. Specifically, DODD explained that after UC-1 sold stock, UC-1 could transfer the proceeds from the stock sales to a bank account in Belize. DODD told UC-1 to then "send us an invoice for something, I don't give a shit what it is, we'll pay you, you stamp the invoice paid ... and you have an invoice for your records." DODD explained how he had provided similar fraudulent invoices for other clients, including his neighbor who operates a food services business, and stated: "we do whatever is needed to get the job done — for example, we falsify invoices for my neighbor all the time."

12.     Also during these meetings in Panama, the defendant MICHAEL J. DODD advised that he had "hundreds" of clients and that "we handle a lot of people's money." At the conclusion of the meeting at DODD's residence, the following conversation ensued:

> UC:     So you think the business model we just discussed will
>         work?
>
> MD:     Uh-huh. You don't present any problems.
>
> UC:     Awesome. Awesome.
>
> MD:     What you proposed to me is nothing that we haven't done
>         in the past, there is nothing new here.

13.     On or about December 11, 2014, UC-1 downloaded and installed proprietary encryption software provided by the defendant MICHAEL J. DODD's company. DODD had previously urged UC-1 to download and use the software, which allows for encrypted

online chats and voice communications. DODD had also advised UC-1 that the defendant KENNETH ARDELL LANDGAARD was using this encryption software, so that UC-1 and LANDGAARD could communicate securely.

14. On or about December 22, 2014, the defendant KENNETH ARDELL LANDGAARD and UC-1 exchanged encrypted online chat messages, which were recorded by the FBI.[1] UC-1 advised LANDGAARD about his illegal market manipulation and kickback scheme and LANDGAARD expressed interest in transporting cash for UC-1 for a 10% fee. The following conversation ensued between LANDGAARD ("KL") AND UC-1 ("UC"):

KL:    I am online.

       ...

UC:    I am a stock promoter. Are you familiar with securities industry?

KL:    Very.

UC:    penny stocks?

KL:    Yes.

UC:    securities and exchange commission (pains in the ass)?

KL:    Yes!!! Huge pain.

UC:    part of what I will do is convert the cash to stock to generate liquidity in these otherwise illiquid stocks. In part, I generate liquidity in stocks to "magically" get the price up. Then dump it asap ... i am looking to get this done without the eyes of the SEC, IRS ... i do many large deals generating millions.

KL:    Understand.

---

[1]   UC-1 was located in the Eastern District of New York during this online chat and for most of his subsequent communications with the subjects by cell phone, encrypted online chat, encrypted voice call, email or text message. UC-1 had represented himself to be a "New York" stock promoter to the subjects.

UC:     i can explain more to you, but that is it in a nutshell. what is the process to get it delivered?

KL:     So do u [you] have a service that has been helping to this point

        ...

UC:     No I do not have a cash delivery service. I generally get paid with wires or stock. Many of the stock issuers or officers of these companies would prefer to kick back in cash so as to not leave any possible trail. I would also prefer to be compensated in cash for that reason. It is my understanding that you aircraft can accomplish this. Is that correct?

KL:     [pause]

UC:     Are u [you] still on?

KL:     Yes. Do I show online?

UC:     yes. do you transport as well?

KL:     Yes. Just depends where, though.

UC:     How much at a time and what is approximate cost?

KL:     Needs to b [be] enough to offset equipment, but im [I'm] usually -- Depends on what end result is but full service 10 pts [10%,] if just trans [transport] a little lower but depends on where

UC:     ok. can smaller amounts be moved on other's flights?

KL:     Yes. What's avg [average] size?

UC:     I am working thru [through] details of deal so I do not current have an average. I will need to see how much and how quickly they get it to me. with the structure Mike[2] has set up for me, I would have it delivered to Panama. Is that workable?

KL:     Yes. Best place.

---

[2]  "Mike" is a reference to the defendant MICHAEL J. DODD.

15. On or about January 20, 2015, the defendant KENNETH ARDELL LANDGAARD and UC-1 exchanged encrypted online chat messages, which were recorded by the FBI. LANDGAARD advised that "we" (LANDGAARD and others) were ready to purchase shares of View Systems (VSYM), which was about to merge, for $0.01 and that he was looking to liquidate his 5 million shares of VSYM at $1.00 or $2.00 per share in several months.[3] LANDGAARD confirmed that he had "a plan to get the price up" and that he would be happy to accept UC-1's "help" to liquidate his stock position. UC-1 then explained in more detail his market manipulation scheme involving corrupt brokers and illegal kickbacks in the following conversation:

KL: Be happy to take help. Green is good.

UC: sounds good. this would be several months away?

KL: Yes. Just getting ready to ramp up.

UC: timing seems to work for me. just need to make sure brokers are willing to put it away.

KL: Do u [you] have a number of them?

UC: yes. they are spread out in various firms.

KL: How many. How much can they eat. And how long to ramp them up.

UC: many. they can eat a lot. they control whale discretionary accounts. They will put it away and clients won't even know. the stock will stay buried there unless you want it sold again.

KL: Very nice. What's the cost.

---

[3] Based on training and experience, I believe that the defendant KENNETH ARDELL LANDGAARD's stated goal of selling the stock, which was then trading at $0.01, at $1.00 or $2.00 just a few months later, indicates that LANDGAARD is engaging in, or at least planning to engage in, securities fraud, because LANDGAARD's target price would represent a short-term return of 10,000% to 20,000%, which is typically not achieved without engaging in illegal market manipulation.

UC:     We get anywhere between 30 and 50 percent on the deal.
        Broker gets about 75% of that I get about 25% of that.

KL:     Ok.

UC:     that's why the higher you can pump it up the more we all
        eat. You, me and the broker ...

KL:     Yes.

        ...

UC:     one last thing.  obviously the clients do not know brokers
        are getting paid for purchasing stock. please keep that
        quiet. good?

KL:     Of course.

In the course of this conversation, LANDGAARD also asked about the first cash shipment for

UC-1 in the following exchange:

KL:     How are your other things going?

UC:     My deal is coming together. Future stock deal lined up is
        very excited about paying me in cash to get out of their
        position. hoping first shipment will be in February.

KL:     Ok.  how much for first you think.

UC:     small at first.  around 200,000.

KL:     Ok.

16.     On or about February 25, 2015, UC-1 called the defendant KENNETH

ARDELL LANDGAARD on the encrypted phone system.  This call was recorded by the FBI.

UC-1 again explained his illegal broker bribery scheme and advised that he would like

LANDGAARD to transport $1.2 million cash in six shipments of $200,000 each.  UC-1 told

LANDGAARD that the money was a "kickback" payment and that UC-1 needed the cash

transported to Panama and then wired to shell companies maintained by the brokers in a manner

that did not leave a trail to UC-1 or the brokers. UC-1 advised that he wanted the money to be transferred off-shore to "keep away the eyes of all the guys that are going to get me in trouble: the SEC, the IRS, the FBI." LANDGAARD agreed to the proposed six transactions of $200,000 each, but advised that he would not be making a lot of money on these smaller shipments and that he was hoping for larger shipments of $1 million or more in the near future. LANDGAARD advised UC-1 to put the cash in a "nice" Louis Vuitton duffel bag for the handoff. LANDGAARD confirmed that his fee for transporting the cash to Panama was 10% and that DODD would be handling the cash deposits for these shipments. UC-1 reiterated that brokers were putting stock into discretionary "whale accounts" and that the customers didn't even know that the stocks were being purchased. UC-1 explained that the brokers "will get the price up" and that "as long as they get paid, they don't care...but it's not cheap, though" to which LANDGAARD replied: "but, you know, when you're basically turning thin air into money, that's the price to pay." UC-1 noted that "these things are, to be blunt, pieces of shit stock" and that "the brokers don't believe in the companies, but they believe in getting 30% to 40% ... and that's what makes it work." LANDGAARD replied: "they don't need to believe in the companies, they believe in greed." UC-1 and LANDGAARD then agreed that mid-March would be a good time for the first shipment and that they would coordinate the exact date later.

        17.    On or about March 2, 2015, UC-1 called the defendant KENNETH ARDELL LANDGAARD on the encrypted phone system. This call was recorded by the FBI. LANDGAARD asked when the first shipment of $200,000 would be ready. UC-1 advised that he would not get paid until March 17 or 18, 2015 because the brokers would not be starting the buying until March 11 or 12, 2015 and it took an additional three days for the trades to settle. The following conversation ensued:

KL:     Is the price pumped up where it needs to be?

UC:    It's uh, they are doing releases [press releases], you know, they're buying it back and forth, and trading it back and forth, so it's ratcheting it up right now.

KL:     Got you.

      ...

KL:     How long does it usually take to get the value [stock price] up?

UC:    Not long at all, not long at all, because we have market makers on both sides of the thing, so they can keep bidding it up, you know what I mean? Because we control both sides, so we kind of get that thing going pretty good.

KL:     Alright... That sounds good.

UC-1 mentioned another deal with a cash shipment of $1 to $3 million in a few months and LANDGAARD agreed to travel to New York to pick up that larger shipment. Regarding the $200,000 shipment, UC-1 and LANDGAARD agreed to meet for breakfast in Ft. Lauderdale, Florida on or about March 18, 2015. UC-1 advised, "and I can have somebody meet you right after our breakfast with the cash," to which LANDGAARD replied, "okay, that's fine, not a problem, that will be great."

     18.    On or about March 9, 2015, UC-1 called the defendant KENNETH ARDELL LANDGAARD on the encrypted phone system. This call was recorded by the FBI. UC-1 and LANDGAARD confirmed that they would meet on March 18, 2015, for breakfast at a hotel in Ft. Lauderdale, Florida and that UC-1's "guy" would meet them to deliver $200,000 in cash to LANDGAARD. UC-1 asked whether LANDGAARD was coordinating with the defendant MICHAEL J. DODD how LANDGAARD would deliver the cash to DODD in Panama and LANDGAARD confirmed that he was coordinating the delivery of cash with DODD.

19.     On or about March 18, 2015, UC-1 met the defendant KENNETH

ARDELL LANDGAARD at a restaurant at a hotel in Ft. Lauderdale, Florida, and an undercover

agent posing as a courier ("UC-2") delivered a Louis Vuitton bag which contained $200,000 cash.

UC-2 placed the bag on the chair next to UC-1 and departed after a very brief introduction to

LANDGAARD.  At the conclusion of the meeting, LANDGAARD took the bag with the

$200,000 cash and left the hotel.  During this meeting, UC-1 talked about his securities fraud

scheme in general terms and LANDGAARD replied, "I understand what you are up to."

LANDGAARD advised that he would notify UC-1 when the cash was delivered to the defendant

MICHAEL J. DODD, but that he would do so only on the encrypted chat system.

LANDGAARD warned UC-1 about leaving an electronic trail.  This meeting was recorded by the

FBI.

20.     On or about March 24, 2015, the defendant KENNETH ARDELL

LANDGAARD advised  UC-1 during an encrypted voice call, which was recorded by the FBI,

that he transported the cash to Panama and gave it to the defendant MICHAEL J. DODD.

LANDGAARD confirmed that he traveled with the cash, and that "it went smooth."

21.     On or about March 25, 2015, the defendant MICHAEL J. DODD advised

UC-1 during an encrypted voice call that he received the cash in Panama, that Accountant-2 was

making daily deposits of about $6,000 into various accounts, and that "about a third is in the

bank."[4]  UC-1 told DODD that he was planning to deliver $2 million in cash to the defendant

KENNETH ARDELL LANDGAARD in New York for transport to Panama and DODD advised

that such a large amount "will take time, but was doable."  UC-1 advised DODD that the money

---

[4]   I believe that "a third" is a reference to one third of UC-1's cash delivered to the defendant
MICHAEL J. DODD by the defendant KENNETH ARDELL LANDGAARD and that "in the bank" is a
reference to completed cash deposits into Panamanian bank accounts controlled by DODD.

"is not drug money, it isn't terrorism, it's just stock money, stock fraud." This call was recorded by the FBI.

22.     On or about April 20, 2015, the defendant MICHAEL J. DODD met UC-1 in UC-1's Manhattan office. DODD expressed concern that the defendant KENNETH ARDELL LANDGAARD was not declaring the cash in Panama as required by Panamanian law. Specifically, DODD was concerned that LANDGAARD would get caught, would be sent to Panamanian jail and "talk."[5] DODD confirmed that LANDGAARD personally delivered $180,000 cash to DODD (the $200,000 minus LANDGAARD's 10% fee). DODD advised that Accountant-2 was making daily deposits of about $9,000 into three different bank accounts in Panama, each deposit being below the $10,000 threshold triggering a deposit declaration under Panamanian law. DODD explained that he did not want to wire funds from all three bank accounts to a single bank account of UC-1. DODD requested that UC-1 provide him with three different bank accounts, so that a portion of the money could be transferred from each of DODD's three accounts to one of the three UC-1's bank accounts. DODD explained that if there was a problem with one account, there would be two other accounts to continue the wire transfers. DODD assured UC-1 that he could wire the funds to UC-1 within a week of receiving the account information.

23.     On or about April 30 and May 8, 2015, UC-1's accounts in the Eastern District of New York received a total of five wire transfers from the defendant MICHAEL J. DODD's accounts in Belize and Panama. Each wire transfer included "Other Beneficiary

---

[5]  Based on my training and experience and the context of this conversation, I believe that the defendant MICHAEL J. DODD's reference to "talk" was a reference to the defendant KENNETH ARDELL LANDGAARD disclosing the illegal money laundering scheme being perpetrated by DODD and LANDGAARD to Panamanian authorities, which would then lead to the arrest of DODD for his illegal activities.

Information," an optional field typically used to identify the purpose of the wire payment, such as an invoice number.  The payments and other beneficiary information are summarized as follows:

| DATE | FROM | TO | OTHER BENEFICIARY INFORMATION[6] | AMOUNT |
|------|------|-----|----------------------------------|--------|
| 04/30/15 | Belize | New York | Purchase of servers | $37,250.00 |
| 04/30/15 | Panama | New York | Payment for purchase of servers | $37,215.00 |
| 04/30/15 | Belize | New York | Purchase of firewall | $30,250.00 |
| 05/08/15 | Panama | New York | Payment of invoice 3033 | $58,450.00 |
| 05/08/15 | Belize | New York | Invoice payment | $9,800.00 |
| Total[7] | | | | $172,965.00 |

The additional wire information was not consistent with the true nature of the wire transfer, as UC-1 did not purchase any servers or firewalls and did not make payments for invoice no. 3033 or any other invoices.[8]

24.    On or about May 7, 2015, UC-1 called the defendant KENNETH ARDELL LANDGAARD on his cell phone.  LANDGAARD confirmed the meeting for May 12, 2015 and suggested a delivery of the cash at Miami Opa Locka Executive Airport in Miami, Florida. LANDGAARD requested "the same type of luggage" (a Louis Vuitton bag) and said the money would be received by "me or my guy."  LANDGAARD said "I have my other partner, he's older."  This call was recorded by the FBI.

---

[6]   An English translation is provided where the other beneficiary information was stated in Spanish.

[7]   The total amount of funds received in UC-1's accounts, represents the $200,000 in cash provided to the defendant KENNETH ARDELL LANDGAARD on March 18, 2015, minus the fees charged by LANDGAARD (10% = $20,000),  the defendant MICHAEL J. DODD (3% = $6,000), and miscellaneous fees ($1,035).

[8]   Based on my training and experience, I believe that the "other beneficiary information" was designed to create the appearance of a legitimate business purpose, to mislead the bank and law enforcement, and to conceal the illicit nature of the wire transfer.

25.     On or about May 11, 2015, the defendant KENNETH ARDELL LANDGAARD advised UC-1 by text message that "Robert" would be the contact for the cash delivery on May 12, 2015, and provided UC-1 with a phone number for "Robert."

26.     On or about May 12, 2015, UC-2 and another undercover agent ("UC-3"), both posing as couriers, delivered an inexpensive Wal-Mart bag containing $200,000 cash to the defendant JAMES ROBERT SHIPMAN JR., at the Miami Opa Locka Executive Airport in Miami, Florida.  SHIPMAN expressed frustration with UC-2 and UC-3 for not delivering a Louis Vuitton bag.  SHIPMAN explained, "Last time it was a Louis Vuitton bag... You know why? You know why they do that?  Because cops can't get the authority to buy a Louis Vuitton bag, it's too expensive."  SHIPMAN laughed and stated, "Right?  And you guys are laughing, and know what I mean?  They can't get it."  SHIPMAN noted that he didn't want to see what was in the bag, that he would simply "hand it to the next guy" and that he had trouble "a long time ago."[9] Later in the conversation, SHIPMAN again explained the purpose of the Louis Vuitton bags: "The reason we get it delivered in Louis Vuitton bags is cops – they can't get the authorization to buy a Louis Vuitton bag.  And if you think about it, it's very smart."  This meeting was recorded by the FBI.

27.     Shortly after the cash delivery to the defendant JAMES ROBERT SHIPMAN, the defendant KENNETH ARDELL LANDGAARD called UC-1 via cell phone and confirmed receipt of the $200,000 cash.  LANDGAARD spoke in code during this conversation.[10]  LANDGAARD advised that "everything is done" (meaning the cash was received), but complained that two "guys" (couriers) rather than one came, and that they didn't

---

[9]  I believe the defendant JAMES ROBERT SHIPMAN was referencing his conviction in 1981 for a conspiracy to distribute cocaine.

[10]  I have provided my understanding of the defendant KENNETH ARDELL LANDGAARD'S coded statements in parentheses based on the context of the conversation.

bring the right "gift wrapping" (Louis Vuitton bag) for the "vodka" (cash). UC-1 and

LANDGAARD spoke about more "drinks" (cash delivery) in two weeks. LANDGAARD then

admonished UC-1 that there should only be one "drinker" (courier) and the correct "gift

wrapping" (Louis Vuitton bag) for the next delivery of $200,000. LANDGAARD also spoke

about scheduling a "July party" shortly after July 4th for "two" in "one big drink" ($2 million cash

in one trip). This call was recorded by the FBI.

28.     Shortly after the call with the defendant KENNETH ARDELL

LANDGAARD, UC-1 called the defendant MICHAEL J. DODD on the encrypted call system to

tell him about the cash delivery earlier that day. DODD advised that he had already spoken with

LANDGAARD and that "everything is on track." This call was recorded by the FBI.

29.     On or about May 18, 2015, the defendant KENNETH ARDELL

LANDGAARD called UC-1 by cell phone to provide an update in coded language.[11]

LANDGAARD advised that "everything was going well" and that "a third of the bottle has been

poured out" (a third of the cash has been deposited into bank accounts in Panama). UC-1 and

LANDGAARD discussed possible dates for the next "drink" (next delivery of $200,000 cash) as

early as May 27, 2015. LANDGAARD then asked UC-1 about the "bigger bottles" (the $2

million cash delivery). When UC-1 suggested July 8, 2015, as a date for the "large two" (the $2

million cash delivery), LANDGAARD replied, "okay ... that will work... that will be about

perfect." When UC-1 inquired about "drinks" (the cash delivery) at an airport in Long Island,

LANDGAARD stated, "anything is doable with usually just a little planning." This call was

recorded by the FBI.

_____

[11]  I have provided my understanding of the defendant KENNETH ARDELL
LANDGAARD'S coded statements in parentheses based on the context of the conversation.

30. On or about May 20, 2015, the defendant KENNETH ARDELL LANDGAARD called UC-1 on the encrypted system to provide an update in coded language.[12] LANDGAARD advised, "we should be done by Friday" and that "it would be in there" and "all liquid" (meaning that all the cash would be deposited into the Panamanian bank accounts). When UC-1 asked how long it would take to get the "full two back less whatever" (the $2 million minus the fees), LANDGAARD advised that "it will take us a month to six weeks." LANDGAARD further advised that he would like to meet UC-1 in person in Minneapolis, Minnesota prior to the July 8, 2015 delivery to discuss the transaction in detail. This call was recorded by the FBI.

31. Between on or about June 5, 2015, and June 18, 2015, UC-1's accounts in the Eastern District of New York received a total of four wire transfers from the defendant MICHAEL J. DODD's accounts in Belize and Panama. The payments and other beneficiary information are summarized as follows:

| DATE | FROM | TO | OTHER BENEFICIARY INFORMATION[13] | AMOUNT |
|------|------|------|------|------|
| 06/05/15 | Belize | New York | Invoice Payment | $36,039.00 |
| 06/12/15 | Panama | New York | Invoice 8552 | $10,209.00 |
| 06/17/15 | Panama | New York | Payment of Invoice | $24,037.00 |
| 06/18/15 | Belize | New York | Invoice Payments Prof Services | $98,526.29 |
| Total[14] | | | | $168,811.29 |

---

[12] I have provided my understanding of the defendant KENNETH ARDELL LANDGAARD'S coded statements in parentheses based on the context of the conversation.

[13] An English translation is provided where the other beneficiary information was stated in Spanish.

[14] The total amount of funds received in UC-1's accounts, represents the $200,000.00 in cash provided to the defendant JAMES ROBERT SHIPMAN on May 12, 2015, minus the fees charged by the defendant KENNETH ARDELL LANDGAARD (10% = $20,000.00), the defendant MICHAEL J. DODD (3% = $6,000.00), and miscellaneous fees ($5,188.71).

The additional wire information was not consistent with the true nature of the wire transfer, as UC-1 did not receive payments for invoice "8552," for professional services, or for any other invoices.[15]

32.    On or about May 23, 2015, UC-1 met the defendant KENNETH ARDELL LANDGAARD at the Minneapolis-St. Paul International Airport to discuss the logistics for the cash shipment scheduled for July 8, 2015. This meeting was recorded by the FBI. UC-1 again explained to LANDGAARD the stock market manipulation and broker bribery scheme and explained that the $2 million cash to be picked up on July 8, 2015 was part of this scheme: "I got to pay the brokers. This is the fee for putting the stock away. I told you the model. If I put $1 million worth of stock away...or in this case $5 million worth of paper we're going to put away, right? We charge 40% for that, I only get 10%, the brokers are getting 30%; the brokers are getting the bulk of it." UC-1 advised LANDGAARD that the brokers had "discretionary accounts" for wealthy clients and that it was easy for the brokers "to just slip these things [stocks] into accounts, especially when brokers have discretion to do that." UC-1 explained that brokers must not be linked to these payments, "because the customers can't know that the brokers are getting paid." UC-1 further explained the scheme: "obviously, we ned to get the price as high as we can get it, so that everybody benefits ... what we currently do with U.S. account, we buy it [the stock] back and forth to get the price up — because we don't want to get out at $0.001, we want to get out at like $2.00." LANDGAARD agreed to transfer the $2 million for UC-1 and noted that one half of the $2 million would be transported to Panama while the other half would be transferred through corporate accounts in the United States. LANDGAARD also asked how

---

[15] Based on my training and experience, I believe that the "other beneficiary information" was designed to create the appearance of a legitimate business purpose, to mislead the bank and law enforcement, and to conceal the illicit nature of the wire transfer.

quickly UC-1 could line up the next deal and encouraged UC-1 to get the next $2 to $4 million transfer ready.

33.    During the May 23, 2015 meeting, UC-1 advised that he would have to increase his fees to cover the additional fees paid to the defendant KENNETH ARDELL LANDGAARD: "I may have to charge 50% to 60%." LANDGAARD replied, "you do; if you think about it, because they are turning that into — this piece of paper [the stock] is becoming green, because it had no value — that has no value right now. I know exactly what goes on."[16] LANDGAARD explained in detail the fees he would charge for the $2 million transaction: 10% for transport, 4% for depositing and wiring the money, and $25,000 for the airplane. In sum, LANDGAARD's proposed fees are more than 15%, or approximately $305,000 for the $2 million transfer. LANDGAARD stated that his 4% was higher than the defendant MICHAEL J. DODD's 3% fee charged for similar services, but noted: "So just pass that shit on, because they're not getting a better deal anywhere else."[17]  Also during the May 23, 2015 meeting, the defendant KENNETH ARDELL LANDGAARD and UC-1 discussed how they would create fraudulent invoices to further conceal the illicit transfers. UC-1 stated that he wanted "an invoice on file to justify the money coming back" and LANDGAARD replied, "so you got to let me know what you want to do — if you want to generate them, or if you want me to generate them." LANDGAARD agreed to tell UC-1 what to "put on those invoices."  UC-1 also asked about off-shore accounts, and LANDGAARD provided information about setting up accounts in Hong Kong, Panama, Belize, Puerto Rico and the Seychelles. LANDGAARD said his "partner" can set

---

[16]    From the context I believe that the defendant KENNEHT ARDELL LANDGAARD acknowledged his understanding that UC-1's brokers were fraudulently inflating the value of stock which otherwise had no value.

[17]    From the context I believe that the defendant KENNETH ARDELL LANDGAARD is advising UC-1 to increase the fees he charges the sellers of the mostly worthless stock.

up accounts in Belize, the Seychelles and other countries. UC-1 advised that he was trading stock back and forth to drive up the stock price so that "these off-shore accounts would be very beneficial."

33.     Also during the May 23, 2015 meeting, the defendant KENNETH ARDELL LANDGAARD confirmed that he would fly to an airport in Long Island, New York on July 8, 2015 to pick up the $2 million with the defendant JAMES ROBERT SHIPMAN JR., who he described as his "partner."

34.     On or about June 24, 2015, the defendant KENNETH ARDELL LANDGAARD called UC-1 on a cell phone and advised that the defendant JAMES ROBERT SHIPMAN could arrange to have 20-30 off-shore accounts set up in Hong Kong, the Bahamas, the Cayman Islands and several other countries within about 45 days. This call was recorded by the FBI. Later that day, UC-1 called LANDGAARD on a cell phone. LANDGAARD directed UC-1 to "get a cheap prepaid phone this evening" and explained that "we'll have a conversation or two and you can throw it away." UC-1 agreed to purchase a disposable phone and continue their conversation about setting up off-shore brokerage accounts the following day. This call was recorded by the FBI.

35.     On or about June 25, 2015, the defendant KENNTH ARDELL LANDGAARD called UC-1 from a disposable phone and connected the defendant JAMES ROBERT SHIPMAN to the call. LANDGAARD introduced SHIPMAN as a "world renowned" expert in setting up off-shore accounts and stated that he had gotten SHIPMAN "up to speed" on their scheduled trip (the July 8 meeting in Long Island) and UC-1's "needs" as a stock promoter. When UC-1 asked LANDGAARD whether he was calling from a "burner throw-away," LANDGAARD advised that he was and SHIPMAN stated "mine gets thrown away after this call

— I have a stack of...ten of them." SHIPMAN confirmed that he would throw the phone's SIM card into the "crusher" after this conversation.[18]   This call was recorded by the FBI.

36.   During the June 25, 2015 three-way call, the defendant JAMES ROBERT SHIPMAN asked UC-1 to describe his "needs" and UC-1 explained his illegal broker bribery and market manipulation scheme to SHIPMAN while the defendant KENNETH ARDELL LANDGAARD was also on the line.   UC-1 explained that he needed to buy a large block of stock in one account, possibly in a Hong Kong account, then set up another account, possibly in Belize or Panama.   UC-1 explained that his account must not be in UC-1's name and SHIPMAN replied, "of course."   UC-1 further explained: "what I want to do, I would want to sell out my Hong Kong account, buy in my Belize account, and then I'd want to sell it from my Belize account into another jurisdiction account because, what — bottom line, obviously, before we get involved in these big promotions, I want to — trade it back and forth.   We need to get the price up.   Generally these stocks are like, $0.01, so we need to get the price up and buy and sell between our accounts, so that we still control the float.   We don't lose any of it, until the price gets up.   So that's the gist of these brokerage accounts."   SHIPMAN replied: "I know exactly what you are doing.   25 years ago, I was one of D.H. Blair's biggest accounts."[19]   SHIPMAN further said, "I have a long history, I know exactly what you are doing and obviously you want to sell the stock that belongs to you in an off-shore jurisdiction, have access to it, maybe bring it back onshore in a tax-free environment.   All of those things, that's what I do.   I know exactly what you are doing."   UC-1 further explained that if he did a "cash deal," he would get 60%: 20%

---

[18]      Based on the context of this conversation, I believe the use of disposable phones was an effort by the defendants KENNETH ARDELL LANDGAARD and JAMES ROBERT SHIPMAN to conceal their illegal money laundering operation from law enforcement authorities.

[19]      D.H. Blair & Co.'s retail-brokerage unit and 15 of its officers and employees were indicted on stock-fraud charges in 2000.   Blair's executives and 10 brokers were convicted.

would go to UC-1 and 40% would go to the brokers. UC-1 explained that he had to get the money to the brokers and that "they can't be linked to any of these transactions." SHIPMAN replied, "I understand how they can't take it. Yeah, trust me, I get it. I totally understand." SHIPMAN then asked how many accounts UC-1 would want and UC-1 explained that he would need four accounts, "just to prime the pump with trading the stock back and forth, so we can ratchet it up in those, in different jurisdictions." UC-1 explained that he would set up new accounts for each deal and SHIPMAN replied, "you are doing it the right way.  It is deal specific.  When a deal is done you shut it down.  And you close it down.  And you wind it up and send it on its way.  Never – one of these accounts for two deals in a row – I highly recommend against it." SHIPMAN explained that he would set up the accounts in such a manner that it would be impossible to link the accounts. SHIPMAN advised, "It's guerilla warfare, and if you don't burn the fort down, you will have a problem."[20]   When UC-1 asked about the handling of cash, SHIPMAN advised that there were a number of ways to "break the cycle" for the "proceeds from the stock", but noted that "even though this is a burner phone, I don't want to say a whole lot – I will tell you in person." UC-1 told SHIPMAN that he did not want to go to jail, to which SHIPMAN replied, "I have a saying: I want to have a big house with a yard, I just don't want to share it."

37.     In the same three-way call, the defendant JAMES ROBERT SHIPMAN outlined a possible tax evasion and money laundering strategy UC-1 could use to repatriate $2 million in cash to the United States. SHIPMAN explained that if UC-1 had $2 million off-shore, he could repatriate the money to the United States and "never pay a dime of taxes," by claiming to have "a long-lost relative in Panama or Belize who dies and leaves you money — we all know

---

[20]     Based on the context of this conversation, I believe that SHIPMAN's reference to "burn the fort down" means that UC-1 should use the off-shore accounts only for one deal, shut them down, and open new accounts for the next deal.

the exemption level on inheritance taxes is fairly high at the moment, and that's just a simple way and there is more. I mean, in person, I will tell you a number of things."

38.     During the same three-way call, the defendant JAMES ROBERT SHIPMAN confirmed that he would travel to New York with the defendant KENNETH ARDELL LANDGAARD for the July 8, 2015 meeting with UC-1. UC-1 stated that this deal involved the buying of $5 million worth of stock and the payment of $2 million in cash. UC-1 again explained that he was paying brokers and wanted the brokers set up with off-shore accounts. SHIPMAN replied, "we can do that, but we don't want any connection between them and you and those accounts, because if they ever get jammed up and start giving you up, we want to be able to cut the tie." UC-1 explained that he wanted off-shore accounts for the brokers so that he could deposit their portion of the $2 million into those accounts and SHIPMAN replied, "no problem, no problem, no problem ... exactly, we can do all of that and more." SHIPMAN stated that he would provide UC-1 with additional details on how best to set up off-shore accounts during the July 8 meeting and stated: "I know what you are doing. I know what you need. I know how to keep you safe. And that's my job." At the conclusion of the meeting, UC-1 explained that he needed SHIPMAN to "keep those three letters away from me, the SEC, the IRS, the FBI," and SHIPMAN replied, "I can do that in my sleep, Ken will tell you that I'm very efficient at that." LANDGAARD replied: "yes, highly effective."

39.     On or about July 3, 2015, the defendant KENNETH ARDELL LANDGAARD confirmed in a text message that he would meet UC-1 on July 8, 2015 at MacArthur airport. The message was preserved by the FBI.

40.     Based on my training and experience, the money transfers orchestrated by the defendants MICHAEL J. DODD, KENNETH ARDELL LANDGAARD and JAMES

ROBERT SHIPMAN JR., do not have any legitimate business purpose. LANDGAARD transported cash, which was received from UC-1 in the United States, to Panama, only to have it wired back to UC-1 in the United States. For this "service" DODD and LANDGAARD charged 13% to 15%. They charged this fee even though any legitimate business person in the United States could simply deposit the cash into a U.S. bank account at no (or minimal) cost. Based on my training and experience, I believe that DODD, LANDGAARD and SHIPMAN have structured these transfers specifically to conceal and disguise the nature, location, source, ownership and control of UC-1's cash and to avoid transaction reporting requirements.

       41.     Because public filing of this document could result in a risk of flight by the defendants MICHAEL J. DODD, KENNETH ARDELL LANDGAARD and JAMES ROBERT SHIPMAN JR., as well as jeopardize the government's ongoing investigation, your deponent respectfully requests that this complaint, as well as any arrest warrant issued in connection with this complaint, be filed under seal.

42.     WHEREFORE, your affiant respectfully requests that arrest warrants be issued for the defendants MICHAEL J. DODD, also known as "Mike" and "Michael Stanley," KENNETH ARDELL LANDGAARD, also known as "Ken" and JAMES ROBERT SHIPMAN JR., also known as "Robert," so that he may be dealt with according to law.

Dated:   Brooklyn, New York
         July 7, 2015


THOMAS McGUIRE
Special Agent, FBI


Sworn to before me this
7th day of July, 2015


THE HONORABLE LOIS BLOOM
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK